Siegmund Weinberg *v.* Eugene R. Norton.

February Term, 1935.

Present: Powers, C. J., Moulton, Thompson, and Sherburne, JJ.

Opinion filed May 7, 1935.

*Marvelle C. Webber* and *Joseph B. McCormick* (of Granville, N. Y.) for the defendant.

*Lawrence, Stafford & O'Brien* for the plaintiff.

THOMPSON, J.    This is a bill in equity praying for an accounting and an injunction.    There was a hearing before the chancellor, and a finding of facts was filed.    There was a decree for the plaintiff ordering an accounting, and granting an injunction ordering the defendant to remove his quarrying machinery and equipment from certain lands of the plaintiff and restraining him from dumping waste, rubbish, or other material onto such lands.    The defendant appealed from the whole decree, but the only question raised here is whether that part of the decree granting the injunction is supported by the findings.    Exceptions taken to certain findings, to the failure of the chancellor to find as requested, and to the exclusion and admission of evidence are brought before us by a bill of exceptions.

The plaintiff is the owner in fee of a large tract of slate-bearing lands in the town of Wells, Vt.    The defendant is the successor of Morris Roberts and Robert A. Roberts to all the rights and privileges granted and conveyed to them by a lease executed to them by the plaintiff of a part of said lands on September 12, 1914.    The question before us raises the right of the defendant to erect and maintain a mast or derrick, to maintain a slate yard, and to erect and maintain buildings and quarrying machinery and equipment on lands of the plaintiff outside of those described in the lease, which is hereinafter referred to as the Weinberg lease.

The lands covered by the lease are described as follows:

> "Bounded on the north by the south line of lands supposed to be owned by Peter Troy and others, on the east by the highway leading from South Poultney over Downs Hill, so-called, to Lake St. Catherine; on the south by a line parallel with and 585 feet distant from the south line of said Troy lands; and on the west by a line 500 feet west of the west side of said highway."

The lease gave to the lessees:

"* * * the right and privilege to fasten and anchor cables, wire ropes and other necessary and proper instruments for the support of inclines and quarrying equipment and machinery, to be used and operated upon the lands above described, for and during so long a time as the parties of the second part shall well and faithfully keep and perform the terms, covenants and conditions of this lease."

The lease also provided:

"The party of the first part reserves the right and privilege for himself and the lessees of other lands holding under him, to fasten and anchor cables and guy ropes and other means of support upon the lands above described, provided that such cables or guy ropes shall not interfere with the reasonable and proper working and operation of a slate quarry by the parties of the second part. This privilege is intended to be a reciprocal privilege, entitling the party of the first part and his lessees to the same rights of anchorage, etc., that the parties of the second part have under the provisions above set forth upon adjoining lands of the party of the first part."

The lessees covenanted that they would enter upon said lands and in good faith and with suitable and proper incline, machinery, tools, and quarrying equipment, commence the development, working and operation of a slate quarry upon said lands, and operate the same for at least nine months in each year. The lease provided for the payment of certain royalties to the plaintiff for all slate quarried and manufactured upon said lands. At the expiration of eight years, if the royalties did not amount to $75 per month, such lands as were not actually occupied by a slate quarry in operation, from which slate was being made and quarried, should revert to the lessor and be released from the lease, and all rights of the lessees should cease unless they elected to pay $75 per month royalty for the use of

the lands described in the lease. The lessees also covenanted that they would not dump rubbish or waste material upon any slate vein or into any quarry pit upon said lands. The lease provided further that it should bind the heirs, executors, administrators and assigns of the respective parties.

One William Downs and others owned the lands easterly of the highway mentioned in the lease. The center line of the highway was the easterly boundary of the plaintiff's lands and the westerly boundary of the Downs lands.

The Roberts went into possession of the lands described in the Weinberg lease and began operations, but the operations were carried on only a few months when, before any royalties for slate taken out under that lease had been paid to the plaintiff, they discovered that the better slate producing rock extended easterly across the public highway leading over Downs Hill onto the land owned by William Downs and others.

After the Roberts discovered that fact, they, on October 17, 1914, obtained a written lease, hereinafter called the Downs lease, from the owners of the Downs lands of a parcel of their land lying easterly of the highway, 618 feet east and west and 585 feet north and south. That lease granted to the lessees ''The right and privilege to fasten and anchor guys, cables and other necessary support for incline sticks, derrick and other proper and necessary quarrying machinery.'' The lease provided for the payment of certain royalties for all slate quarried and manufactured on the leased lands. It also provided that the lessees, when the slate quarry was developed to the west line of the lands described in the lease, might work and carry on the slate quarry in connection with quarrying operations on lands of the plaintiff.

The plaintiff and the owners of the Downs lands were anxious to have a slate quarry developed and operated upon the lands they had leased to the Roberts, but it was impracticable to develop and operate such a quarry upon the leased lands without it being operated upon them in common, and it was impossible to set up and properly install machinery for the operation of a quarry upon either of said lands without guys and cables being fastened upon the lands of the other party.

On October 31, 1914, the owners of the Downs lands, as parties of the first part, and the plaintiff, as party of the second

part, at the request of and for the benefit of the Roberts, executed an agreement which provided:

> "* * * that the said Morris H. Roberts and Robert A. Roberts, or successors, may set up machinery and fasten the same, and the guys and cables attached thereto and used in connection therewith, upon either of their said lands as may be necessary, and that the said Morris H. Roberts and Robert A. Roberts may commence to operate said slate quarry upon the lands of said Weinberg hereinafter described, and continue said operation across the highway onto and upon lands of the said parties of the first part hereto."

The lands of the plaintiff referred to in the agreement are described therein as follows:

> "The lands referred to herein and to which this agreement applies and shall apply are 148 feet in width, north and south, and that the northerly line of such lands begins at a point 129 feet south of the division line between lands of Peter Troy and others and lands of said Siegmund Weinberg, on the west line of said highway leading over Downs Hill, so-called, and extends to a point in the east line of the lands leased to said Morris H. Roberts and Robert A. Roberts by William Downs and others, which said point is 385 feet distant southerly from the division line between lands of said Downs and said Troy."

The agreement provided that the royalties for all the slate quarried and manufactured in the said two lines for the distance of 148 feet extending northerly and southerly should be equally divided between the parties thereto so that they should at all times be equally interested in the slate quarried from the slate rock between the said lines to the eastern limit of the lands leased by the owners of the Downs lands to the Roberts. The agreement provided further that the Roberts, or their successors, "may fasten guys and cables upon any lands of Weinberg and Downs to operate a quarry on lands leased them by both

parties.'' It also provided that the agreement should apply to and bind the successors, heirs, administrators and assigns of the respective parties.

The chancellor found (par. 13):

> ''It was the mutual intent, purpose and agreement of the lessors, Siegmund Weinberg and William Downs and others, and of the lessees, Morris H. Roberts and Robert A. Roberts, that the two leases should be worked and operated in common as one quarry property with interchangeable rights and privileges as to erecting masts, fastenening guys and anchors and using quarry equipment; and this agreement was made binding upon their executors, administrators and assigns.''

In 1923, the defendant, through various assignments and conveyances to him, became the sole owner of all the rights and privileges granted and conveyed to Roberts & Roberts by the Weinberg and Downs leases and the agreement of October 31, 1914, and of the entire quarrying business and all the quarrying machinery and equipment of Roberts & Roberts in the town of Wells. Thereafter, he carried that business on under the name of Norton Brothers. He acquired the fee to the lands covered by the Downs lease three or four years before this case was tried below.

In May or June, 1927, the defendant erected a new mast on lands of the plaintiff outside of those covered by the Weinberg lease, and from nine to fifteen feet west of the westerly boundary of such lands, and anchored the same with about twenty guy ropes and anchors outside of the leased area. To this mast two cables were attached, one leading to the Downs quarry opening southerly of the 148-foot strip described in the agreement of October 31, 1914, and the other to the old quarry opening located in the southeasterly portion of the leased lands in the Weinberg lease. The so-called new opening to which one of the cables led was partly on the Weinberg lease and partly on the Downs lease. At about this time, the defendant also established a new slate yard and erected shanties thereon. The chancellor found that some of this yard extended southerly of the southerly line described in the Weinberg lease, but he was

unable to find from the evidence how far southerly of that line the yard extended.

The chancellor found (par. 27):

> "While the erection of a new mast and locating of a new yard in connection with new operations were reasonably required for the operation of the two leases in common, the defendant had no right to locate this mast or any portion of this yard on Weinberg's land outside of the area described in the Weinberg lease of September 12, 1914. This new mast being erected outside of the leased area, the defendant had no anchorage rights for same outside of the leased area. While, until a short time previous to the bringing of this suit, there had been no survey of the lines of the Weinberg lease, there was no reason why the defendant could not have established the lines bounding the land described in the lease of September 12, 1914, before erecting additional quarrying equipment and locating yards, roads, etc. The material for this new mast was purchased from the plaintiff's mill by the defendant and was delivered by the plaintiff's agent. However, the evidence does not establish knowledge on the part of the plaintiff that this mast was to be erected outside of the area described in the agreement of September 12, 1914."

At about the same time that the new mast was erected, the defendant erected a power house about 150 feet southwesterly of the tract of land described in the Weinberg lease. The chancellor found (par. 28):

> "This building was about 20 feet by 20 feet. The defendant was without right to erect this building outside of lands covered by the Weinberg lease of September 12, 1914, and its erection outside of this area is without permission or license from the plaintiff."

Findings 40, 42 and 46 are as follows:

"(40) The evidence does not establish that any rubbish was deposited on the Weinberg lease on any underlying slate vein. To some slate men prospects of a slate deposit immediately west and south of the Weinberg lease of September 12, 1914, appear favorable, especially to the south. To other slate men prospects for slate in these localities do not appear to be good. Whether a slate deposit does lie west or south of said lease is a matter of speculation. However, since there are some slate men to whom the prospects appear favorable, it follows that the plaintiff has a reasonable prospect of leasing these lands for prospecting and development, and this prospect of leasing said lands is decreased by defendant's maintaining thereon a mast, engine house, road and slate yard. Prospects for slate being found adjacent to the Weinberg lease are better to the south than to the west. Should this land be leased, whether or not a workable slate rock deposit would be found is a matter of speculation."

"(42) While the establishment of a new yard was reasonably necessary in defendant's operations outside of the 148-foot strip, he had no right to establish the same or any portion of same outside the area described in the lease of September 12, 1914. The same is true of the road leading to the yard. Both should have been kept within the area covered by the lease. Approximately the southern half of the portion of said new road running easterly and westerly is southerly of the south line of lands described in said lease. The westerly line of this lease, as shown by the survey of Mr. Haye, defendant's engineer, is not located in accordance with the terms of said lease of September 12, 1914."

"(46) The location of the power house and all or a portion of the slate yard and the new mast

outside of the premises described in the lease of September 12, 1914, is a material damage to the premises of the plaintiff.''

In paragraphs 6, 7, and 10 of the decree, the court below adjudged as follows:

''6. In erecting the so-called new mast, locating shanties and slate yards or portions thereof, power house and road outside of the area described in the Weinberg lease and upon other lands owned by plaintiff, defendant had acted without right or authority and in violation of the plaintiff's rights.''

''7. Defendant's right to fasten guys and cables upon lands of plaintiff outside of the lands described in the Weinberg lease does not extend to cables or guys attached to machinery or equipment located on plaintiff's land outside of lands described in said lease.''

''10. The defendant shall forthwith remove from plaintiff's lands outside of lands described in the Weinberg lease, all his slate, equipment, machinery, masts, derricks and structures, including power house and all guys, cables and ropes fastened to same.''

The defendant contends that, upon the findings made, it was error for the court to adjudge in the decree as it did in those paragraphs.

He also contends that the court erred in decreeing:

''11. Defendant, his servants and employees, are hereby restrained from dumping any waste, rubbish or other material on lands of plaintiff outside of lands describted in the Weinberg lease, or from in any way occupying said outside lands.''

That the rights of the parties are governed by the provisions of the Weinberg and Downs leases and the agreement of October 31, 1914, is not disputed. The defendant says in his brief:

"It is our contention that properly construed, under these leases and agreements, not only did the lessees have the rights and privileges, but they also had the obligations to erect and maintain all suitable machinery necessary to operate these two quarries as one quarry to the best advantage of all concerned, and this included not only masts and guy wires, but also power house and the making of roads for the purpose of carrying on the quarrying operations and for the establishment of yards to store the slate."

While the defendant does not explicitly set forth in this statement that it is his contention that he has the right under the leases and agreements to erect and maintain masts, suitable quarrying machinery and equipment, to build roads and establish slate yards on lands of the plaintiff outside the lands described in the Weinberg lease, that is in fact his contention in this Court, and we so consider it. This contention cannot be sustained.

The Weinberg lease provides specifically that the lessees shall have the right and privilege "to fasten and anchor cables, wire ropes and other necessary and proper instruments for the support of inclines and quarrying equipment and machinery, *to be used and operated upon the lands*" (italics are ours) described therein. That lease also reserves to the plaintiff and the lessees of other lands holding under him a reciprocal privilege entitling them "to the same rights of anchorage, etc." that the lessees under the Weinberg lease have upon adjoining lands of the plaintiff.

The Downs lease grants to the lessees "the right and privilege to fasten and anchor guys, cables and other necessary support for incline sticks, derrick and other proper and necessary quarrying machinery."

In the agreement of October 31, 1914, in which the plaintiff and the owners of the Downs lands gave the Roberts the right to operate a slate quarry upon the lands leased to them by Downs and others and a part of the lands covered by the Weinberg lease in common, it is stated that one of the reasons for executing that agreement is because "it is impossible to set up and properly install machinery upon either of said lands

for the operation of a slate quarry upon either of said lands without guys and cables fastened upon the lands of the other party or parties.''

That agreement gave the Roberts, and their successors, the right "to set up machinery and fasten the same, and the guys and cables attached thereto and used in connection therewith, upon either of their said lands as may be necessary, * * *.'' That the "said lands" referred to are the lands covered by the Weinberg and Downs leases appears clearly from other provisions of the agreement, and, particularly, from the provision that "said Morris H. Roberts and Robert A. Roberts, or successors, may fasten guys and cables upon any lands of Weinberg and Downs to operate a quarry on lands leased them by both parties.''

It is not claimed by the defendant that he was given an express right by the provisions of the Weinberg lease or of the agreement of October 31, 1914, to erect and maintain masts, suitable quarrying machinery and equipment, to build roads and establish slate yards on the lands of the plaintiff outside of those described in the Weinberg lease; but he alleges in his answer and contends here that it is customary and understood that one who leases a parcel of land of small dimensions for operating a quarry thereon impliedly grants to the lessee the right to erect necessary quarrying machinery and equipment on lands of the lessor outside of those covered by the lease.

Fred Sheldon, a witness for the defendant, was asked on direct examination as to whether the Weinberg lease was large or small, and he replied, "It is very small—'' The Court, on objection being made, asked: "How is that material?'' Counsel for the defendant replied:

"In this way, that taking a quarry of only 500 feet one way and 585 feet the other way, with a lease or privilege to go in there and take out such slate rock as there is in it, that size would not be sufficient to set up the machinery within the limits of those lines so as to carry out the privileges of the lease without pitching your anchors on adjoining lands of the lessor.''

The defendant, after some discussion, made the following offer:

> "We offer to show in this connection that it is the practice and custom in the slate belt, where leases are of small size, a privilege granted to take out the slate in the leased land, that it is the general custom for the owner, for the lessor, to permit the anchoring of masts by guy wires on his other lands, and that that custom was so generally known that Mr. Weinberg was charged with notice of it, so there was an implied right to pitch the guys."

It is not necessary to consider if the court erred in excluding the evidence that was offered. If there was error, it was harmless because, by the provisions of the Weinberg lease and of the agreement of October 31, 1914, the defendant is given the express right to fasten and anchor guys and cables, which are necessary for the support of masts, quarrying machinery, and equipment erected and installed on the lands described in the Weinberg lease, on any lands of the plaintiff. That is the only right which the defendant sought to establish by the evidence which was excluded.

So far as it has been called to our attention, no evidence was introduced or offered which tended to show that the lessee of lands for slate-quarrying purposes has the implied right to erect and install masts, quarrying machinery, and equipment on lands of the lessor other than those described in the lease.

It appears clearly from the provisions of the Weinberg and Downs leases and of the agreement of October 31, 1914, that it was the intention of the parties executing those instruments that Roberts & Roberts, or their successors, should have no rights in the lands of the plaintiff and of Downs and others outside of the lands described in their respective leases except the right to anchor cables or guys which were necessary to support masts, quarrying machinery, and equipment erected or installed on the leased lands.

In arriving at our decision on this question, we have not disregarded the thirteenth finding of the chancellor, which the defendant has repeatedly called to our attention, that "it was the mutual intent, purpose and agreement of the lessors, Weinberg,

Downs and others, and of the lessees, that the two leases should be worked and operated in common as one property with interchangeable rights and privileges as to erecting masts, fastening guys and anchors and using quarrying equipment.'' There is nothing in this finding from which it can be inferred that the lessees had an express or implied right to erect a mast, a power house, build a road, or to establish a slate yard on lands of the lessors other than the leased premises.

The evidence supports the findings of the chancellor that the defendant had no right to locate the new mast, the power house, or any portion of the new slate yard or the new road upon lands of the plaintiff outside of the area described in the Weinberg lease, and the finding that the new mast being erected on lands of the plaintiff outside of the leased area, the defendant had no anchorage rights for the same outside of the leased area.

■ ■ The defendant contends that the plaintiff is estopped by his conduct from objecting to the maintenance of the new mast and other structures by the defendant on lands of the plaintiff outside of the area described in the Weinberg lease.

This defense is not available to the defendant. A cardinal principal in the doctrine of equitable estoppel is that he who claims it must show that he has been misled, and thereby prejudiced, by the conduct of the other party. *Boynton* v. *Hunt,* 88 Vt. 187, 189, 92 Atl. 153; *Pond* v. *Pond's Estate,* 79 Vt. 352, 357, 65 Atl. 97, 8 L. R. A. (N. S.) 212; *Stevens* v. *Blood,* 90 Vt. 81, 86, 96 Atl. 697, and cases cited. No evidence has been called to our attention from which it can be inferred that the defendant was induced by any conduct or silence of the plaintiff to locate the new mast and other structures on the lands of the plaintiff outside of the area described in the Weinberg lease.

■ The defendant excepted to the finding in No. 42 of the findings that: ''Approximately the southern half of the portion of said new road running easterly and westerly is southerly of the south line of lands described in said (Weinberg) lease,'' on the ground that it is not supported by the evidence. Mr. Grover, a civil engineer who did surveying for the plaintiff, testified that the center of the new road running easterly and westerly is practically on the southern line of the Weinberg lease. That being the fact, and we assume that it is for the purposes of this question, the southern half of that portion of

the new road must be southerly of the south line of the Weinberg lease. This evidence supports the finding.

The defendant excepted to finding No. 46, which is that the location of the power house and all or a portion of the slate yard and the new mast outside of the premises described in the Weinberg lease is a material damage to the premises of the plaintiff, on the ground that the finding is not supported by the evidence.

It is doubtful if there is evidence that supports this finding, but it is not necessary to consider that question. We agree with the defendant that the finding is immaterial. If there is any error in the finding, it is harmless. The plaintiff does not ask for damages in this suit because the defendant located and maintained the new mast, road, power house, and slate yard on his lands outside of the area described in the Weinberg lease. He seeks an injunction compelling the defendant to move his structures from those lands and restraining him from doing certain things.

The defendant, under our construction of the Weinberg and Downs leases and the agreement of October 31, 1914, had no right to locate and maintain the structures in question on the lands of the plaintiff where they were located. Nor does it make any difference that the encroachments by the defendant onto the lands of the plaintiff outside of the area described in the Weinberg lease were slight. The right of the defendant to erect structures on the lands of the plaintiff for quarrying purposes is limited to the area described in the Weinberg lease, and the defendant has the right to insist that those limits shall be strictly observed by the defendant.

The defendant excepted to the failure of the court to find as requested in Nos. 48, 49, and 50 of his requests for findings. The substance of these requests is that the court find that the new mast and the new yard, the road and power house were all reasonably required for the operations of the two leases in common and reasonably come within the provisions of the two several leases in connection with the Weinberg-Downs agreement and the mutual agreement of the lessors and lessees to operate the two properties as one quarry. In view of what we have hereinbefore said, these requests were properly denied.

If there was error in admitting the testimony of I. Weinberg, son of the plaintiff, that his father had not been able to

lease that portion of his land lying west and south of the Weinberg lease, which we do not decide, the error is harmless.

As the defendant did not have the right to erect the new mast on lands of the plaintiff outside of the area described in the Weinberg lease, it was not error to exclude the evidence offered by the defendant as to the cost of erecting that mast.

The eleventh paragraph of the decree restrains the defendant from dumping any waste, rubbish, etc., on lands of the plaintiff outside of lands described in the Weinberg lease, *"or from in any way occupying said outside lands."* (Italics are ours.)

It is clear, as claimed by the defendant, that the language of this paragraph of the decree that is in italics fails to give force to the provision in the agreement of October 31, 1914, that the lessees, or succesors, "may fasten guys and cables upon any lands of Weinberg and Downs to operate a quarry upon lands leased them by both parties."

There is error here, as this paragraph of the decree deprives the defendant of a substantial right given to him by the agreement of October 31, 1914, and the decree must be modified.

Paragraph 11 of the decree should be modified to read as follows:

> "11. Defendant, his servants and employees, are hereby restrained from dumping any waste, rubbish or other material on lands of plaintiff outside of lands described in the Weinberg lease, or from in any way occupying said outside lands, except for the purpose of anchoring and fastening guys and cables thereon which are necessary for the support of masts, quarrying machinery and equipment located on the lands described in the Weinberg and Downs leases."

Except for this error, we find no error in the proceedings below.

*Decree reversed, and cause remanded with directions that the eleventh paragraph of the decree be modified as herein set forth. Neither party is to recover costs in this Court.*